MORF

FILED

SEP 23 2013

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

NOT FOR PUBLICATION

POSTED ON WEBSITE

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | | |
|---|---|---|
| In re | ) | Case No. 11-15697-B-11 |
| Real Wilson Enterprises, Inc., | ) | DC No. HAR-7 |
| Debtor. | ) | |
| | ) | |

**MEMORANDUM DECISION REGARDING MOTION TO
CONFIRM THIRD AMENDED PLAN**

This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. B.A.P. R. 8013-1.

Hilton A. Ryder, Esq., of McCormick, Barstow, Sheppard, Wayte & Carruth, LLP, appeared on behalf of the debtor, Real Wilson Enterprises, Inc.

Michael S. Abril, Esq., and Keri L. Bland, Esq., of Kuhs & Parker, appeared on behalf of the secured creditor, Citizens Business Bank.

Before the court is a motion by the debtor Real Wilson Enterprises, Inc. (the "Debtor" or "Real Wilson") to confirm its third amended chapter 11 plan (the "Plan"). Secured creditor Citizens Business Bank (the "Bank") vigorously opposes confirmation. Although the court is not yet ready to conclude that Real Wilson is unable to reorganize

1  and pay its debts through a chapter 11 plan, that reorganization will not be through this

2  Plan. The Debtor has not sustained its burden of proof on a number of issues necessary to

3  confirm a chapter 11 plan, including the fundamental requirement that a plan must be

4  accepted by at least one impaired class of creditors. Accordingly, the motion to confirm

5  the Debtor's Plan will be denied.

6       This Memorandum Decision contains the court's findings of fact and conclusions

7  of law required by Federal Rule of Civil Procedure 52(a), made applicable to this

8  contested matter by Federal Rules of Bankruptcy Procedure 7052 and 9014(c).[1]  The court

9  has jurisdiction over this matter under 28 U.S.C. § 1334, 11 U.S.C. § 1129, and General

10 Order Nos. 182 and 330 of the U.S. District Court for the Eastern District of California.

11 This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(L).

12 **Background and Findings of Fact.**

13      Only a brief background is necessary to tee up this ruling. Real Wilson is a

14 corporation. It owns and operates a gas station and mini-mart business in Bakersfield,

15 California (the "Mini-Mart"). The Bank holds a claim that is secured by virtually all of

16 the Debtor's real and personal property assets. The Debtor's schedules declare assets of

17 approximately $1.1 million and a secured debt to the Bank of more than $1.19 million.[2]

18 The schedules also disclose a priority debt owed to the California State Board of

19 Equalization ("SBOE") of more than $233,000. Not disclosed on the schedules is the fact

20 that the Debtor also owes property taxes to the Kern County Treasurer-Tax Collector

21

22 ─────────────────

23      [1] Unless otherwise indicated, all chapter, section, and rule references are to the
     Bankruptcy Code, 11 U.S.C. §§ 101–1532, and to the Federal Rules of Bankruptcy Procedure,

24   Rules 1001–9036, as enacted and promulgated *after* October 17, 2005, the effective date of the
     Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) of 2005, Pub. L.

25   No. 109-8, 119 Stat. 23.

26      [2] The Bank filed proof of its secured claim in the amount of $1,180,100.94. During most

27 of this bankruptcy case, the Debtor has been making monthly "adequate protection" payments to
     the Bank in the amount of $9,716.84. It is not clear how much will be owed to the Bank after

28 application of these payments and adjudication of its attorney's fees.

2

1 ("KCTC") of more than $84,000.[3]

2    Real Wilson is owned by Randeep Dhillon ("Dhillon") who holds 100% of the

3 stock in the corporation. Dhillon also owns numerous other entities, some of which,

4 together with Dhillon personally, have also been before this court in unsuccessful

5 chapter 11 proceedings filed in 2011 at or about the same time as this case.

6    In April 2011, the Bank filed a civil action against Real Wilson and Dhillon

7 seeking the appointment of a receiver and judicial foreclosure of its lien against the

8 Debtor's assets.[4]  Indeed, a receiver was appointed by the state court on May 13, 2011.

9 This bankruptcy was then filed on May 17, 2011, to prevent the receiver from retaining

10 possession of the Mini-Mart.  On May 31, 2011, this court entered orders compelling the

11 receiver to turn over the Mini-Mart to the Debtor and denying the Bank's request to

12 excuse the receiver from the turnover requirement.

13    For months thereafter, this case suffered one frustrating delay after another.

14 Initially, the Debtor blamed the delay on the fact that Dhillon was in his own personal

15 bankruptcy and was unable to focus his attention on administration of this case.  Further

16 delay resulted from the Debtor's inability (or unwillingness) to diligently respond to and

17 complete SBOE's audit of its tax liability.  The Debtor filed its first plan and disclosure

18 statement on January 19, 2012, but was unable to move toward confirmation because of

19 _____

20    [3] KCTC filed a proof of claim showing prepetition property taxes and penalties due for
the tax years 2008 and 2009 in the amount of $47,271.98, for tax year 2010 in the amount of
21 $19,489.40, and for tax year 2011 in the amount of $17,972.86.  With the accrual of interest at
the statutory rate of 18% per annum, KCTC's tax claim has increased substantially since
22 commencement of this case.  For purposes of this contested matter, the Debtor and the Bank
stipulated that KCTC's claim, as of September 1, 2013, would be $111,356.04.  *See* Stipulation
23 Concerning Tax Claims at 2, ECF No. 470.
24

25    [4] The April 2011 litigation was actually the Bank's second judicial foreclosure action
against the Debtor.  The first was filed in August 2010.  It was soon settled, the defaults were
26 cured, and the action was dismissed in October 2010.  The Debtor failed to make timely
payments to the Bank and again defaulted beginning in November 2010.  *See* Declaration of Eric
27 D. Shumate in Support of Citizens Business Bank's Motion for Order Excusing Compliance with
28 Certain Requirements of 11 U.S.C. § 543, ECF No. 32.

1  the unresolved issues with SBOE.  The Plan that is presently before the court was filed on

2  January 17, 2013.[5]

3        The Plan places the Bank's secured claim into Classes 2A and 3A, bifurcating the

4  claim into two separate claims and classes based on the kind of collateral (i.e., real or

5  personal property) but then consolidates their treatment under Class 2A.  Under the Plan,

6  the Bank's secured claim will be treated as fully secured, be amortized over a period of 20

7  years, bear interest at the rate of 5% per annum, and become all due in seven years.  The

8  Plan provides for KCTC's secured property tax claim in Class 2B, which proposes to

9  amortize the entire claim over a period of 60 months after confirmation with interest at

10  the statutory rate of 18% per annum.

11  **Issues Presented.**

12        The Bank objects to confirmation on several grounds, but it does not object to the

13  proposed treatment of its claim.[6]  Nevertheless, the Bank argues that the Plan does not

14  satisfy other elements for confirmation prescribed in § 1129.  For the reasons set forth

15  below, the court agrees with the Bank that the Plan, in its current form, is unconfirmable.

16  In so ruling though, the court will not attempt to address all of the issues raised by the

17  Bank because resolution of each issue is not necessary to the court's ruling and some of

18  those issues, such as the lack of evidence to support the proposed interest rate payable on

19

20  _____

21        [5] The first amended plan and disclosure statement were filed on May 1, 2012.  Approval
   of the disclosure statement was again denied.  The second amended disclosure statement was
22  filed, with a second amended plan, on October 26, 2012.  Before it could be approved, on
   January 17, 2013, the Debtor filed its third amended disclosure statement together with this Plan.
23  The third amended disclosure statement was approved on March 8, 2013.

24        [6] The Bank does object indirectly to the interest rate payable on its claim.  At the
25  confirmation hearing, the Bank argued for the first time that the Debtor had not offered any
   evidence to show that the 5% interest rate satisfies the cramdown requirement of
26  § 1129(b)(2)(A).  The Bank offered the testimony of an expert witness to address what the
   interest rate should be.  The court sustained the Debtor's objection to the testimony because
27  (1) the Bank had not raised the objection before the hearing, and (2) the Bank had not previously
28  disclosed its intention to present an expert for examination by the Debtor.

1  the Bank's claim, are better left for resolution if and when the Debtor attempts to confirm
2  another plan.  Instead, the court will address only those issues that require some legal
3  analysis and resolution to guide the parties if the Debtor proposes another plan.

4         As a result of this contest, the Debtor is now on notice as to the issues it will need
5  to address in a subsequent plan.  The Debtor has already "burned its bridge" with the
6  Bank and demonstrated an inability (or unwillingness) to honor its agreements with the
7  Bank.  *See supra* note 4.  Based on this prepetition history between the parties and the
8  record in this case, it is clear that confirmation of any plan will require a "cram down"
9  over the Bank's objection and that any ruling in favor of the Debtor will be vigorously
10 appealed.  The court trusts that the next plan will be crafted with the appropriate changes
11 and presented with additional evidence to preemptively address the Bank's certain
12 objection.

13 **Analysis and Conclusions of Law.**

14        **Burden of Proof.**  The Debtor, as the plan proponent, has the burden to prove, by
15 a preponderance of the evidence, that its Plan satisfies the applicable confirmation
16 requirements of § 1129.  *See Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re*
17 *Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 653 (9th Cir. 1997).  Even in the absence of
18 an objection, the court has an independent duty to make sure that the Debtor has offered
19 sufficient evidence to sustain a finding that each requirement under § 1129 has been
20 satisfied.  *See Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1213 (9th Cir. 1994).

21        **Acceptance by an Impaired Class: § 1129(a)(10).**  The Bank's most compelling
22 objection goes to the fact that the Plan was not accepted by at least one impaired,
23 noninsider class.  Unless a proposed plan leaves all classes of claims unimpaired, the
24 Bankruptcy Code conditions a debtor's ability to confirm a chapter 11 plan on the
25 requirement that "at least one class of claims that is impaired under the plan has accepted
26 the plan, determined without including any acceptance of the plan by an insider."
27 § 1129(a)(10).  A class of creditors accepts a plan if, of the creditors who vote in that
28 class, "at least two-thirds in amount and more than one-half in number of the allowed

5

claims of such class" accept the plan.  § 1126(c).  Here, the creditors in four impaired classes voted on the Plan by returning ballots; the Debtor argues that one of those classes, Class 5B, has accepted the Plan.[7]  However, the Bank contends that the Class 5B votes cannot be counted.

Class 5B is comprised of three creditors: JAL Enterprises, Inc., Kulsharan Kaur, and Jasvant Singh Gill.  The Debtor concedes that JAL Enterprises, Inc. is an insider, so its acceptance must be disregarded.  *See* § 1129(a)(10).  Similarly, based on the testimony given during the confirmation hearing, it appears that Kulsharan Kaur is also an insider whose vote cannot be considered.  This leaves only Jasvant Singh Gill, whose affirmative vote would arguably make Class 5B an accepting, impaired class.[8]  Nevertheless, as the Bank points out, the court must address a more foundational question of whether the creditors in Class 5B were even entitled to vote in the first place.  The relevant statutory provision here states,

> Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class **do not entitle the holders of such claims or interests to receive or retain any property under the plan** on account of such claims or interests.

§ 1126(g) (emphasis added).  "The legislative history pertinent to this Code section indicates that it is not even necessary to solicit votes from a class whose members are to receive or retain nothing" since they are deemed to have already rejected the plan.  *In re Waterways Barge P'ship*, 104 B.R. 776, 783 (Bankr. N.D. Miss. 1989).

---

[7] According to the Plan, Classes 2A, 2B, 3A, 5A, and 5B are impaired.  The Bank, the sole creditor in Classes 2A and 3A, voted to reject the Plan.  None of the creditors in Classes 2B and 5A returned a ballot.  When no creditors within a class vote to accept a plan, that class is deemed to have rejected the plan.  *See Bell Road Inv. Co. v. M. Long Arabians (In re M. Long Arabians)*, 103 B.R. 211, 215–16 (9th Cir. BAP 1989) (rejecting *In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263 (10th Cir. 1988)).  Thus, four of the five classes have rejected the Plan.

[8] The court is not finding here that Jasvant Singh Gill is not an insider.  It is clear from the evidence that the debt to Jasvant Singh Gill was arranged through some personal relationship with Dhillon.  The exact nature of that relationship, however, has not been explored.

6

1    Here, the treatment of Class 5B is stated in the Plan as follows: "Class 5B
2    consisting of the unsecured claims of Jal Enterprises, Inc. [sic], Kulsharan Kaur and
3    Jasvant Singh [sic] shall be subordinated to payment of [Class 5A] and shall receive no
4    distribution under the Plan." Based on the clear and unambiguous language of the
5    Plan—that these creditors "shall receive no distribution under the Plan"—it appears that
6    the holders of Class 5B claims are not entitled to "receive or retain any property under the
7    plan." Therefore, even if none of the Class 5B creditors were insiders, the court still
8    cannot count their accepting votes as the entire class is conclusively deemed to have
9    rejected the Plan. *See In re Egan*, 142 B.R. 730, 732 (Bankr. E.D. Pa. 1992)
10   (disregarding acceptance vote from a class that would receive nothing under plan); *In re*
11   *Waterways Barge P'ship*, 104 B.R. at 783 (similar).

12        In response, the Debtor argues that the Class 5B creditors are not waiving their
13   claims, that instead they will retain their claims and be paid in some manner outside of
14   Real Wilson's bankruptcy through an agreement with Dhillon. However, § 1126(g) looks
15   to the four corners of the Plan, not to the parties' secret agreement with regard to future
16   payment from a third party. By its plain language, Class 5B creditors will not receive or
17   retain any property under the Plan. Thus, none of the impaired classes have accepted the
18   Plan, and the Debtor has not satisfied this confirmation requirement under § 1129(a)(10).

19        **Treatment of the Secured Property Tax Claim: § 1129(a)(9).** The Bank also
20   objects to the Plan's treatment of Class 2B, containing the fully secured property tax
21   claim held by KCTC. KCTC did not object to, or vote to reject, the Plan, which proposes
22   to amortize its claim over a period of 60 months *after confirmation*. The Bank contends
23   that KCTC's entire claim must be paid within 60 months *after commencement of the case*,
24   which, due to the age of the case (now approaching 2.5 years) and the decreasing amount
25   of the time left in that 60-month window, would substantially increase the amount of the
26   monthly payments to KCTC.

27        The Bank's argument is based on § 1129(a)(9)(D), which governs the treatment of
28   secured tax claims and provides, in pertinent part, the following:

7

(9) Except to the extent that the holder of a particular claim **has agreed to a different treatment** of such claim, the plan provides that—

. . .

   (D) **with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim,** the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

§ 1129(a)(9)(D) (emphasis added).  Subparagraph (D) must be read in conjunction with subparagraph (C), which governs the treatment of unsecured, priority tax claims and states,

   (C) with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim regular installment payments in cash—

      (i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

      (ii) **over a period ending not later than 5 years after the date of the order for relief under section 301** . . . .

§ 1129(a)(9)(C) (emphasis added).  Subparagraphs (C) and (D) both incorporate by reference § 507(a)(8).  This provision gives priority status to certain unsecured tax claims, including one for "a property tax incurred before the commencement of the case and last payable without penalty after one year before [the commencement of the case]."

§ 507(a)(8)(B).  Although it does not appear to be the case, the Debtor and the Bank have assumed that KCTC's entire claim is for such property taxes.[9]

---

[9] Although the Bank's § 1129(a)(9)(D) argument is well taken, neither the Bank, nor the Debtor, has properly analyzed the applicable statutes.  KCTC's proof of claim indicates that its claim includes the property taxes owed in the years 2008 through 2011.  The portion of the KCTC's claim representing the 2008 and 2009 taxes, indeed more than one half of its claim, does not appear to be for taxes "last payable without penalty after one year before [the commencement date]," meaning that the § 1129(a)(9)(C) and (D) analysis should not even apply to that portion. Thus, this discussion is intended to only address that portion of KCTC's claim that "would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8)," rather than KCTC's entire claim.  The court sees no reason why the

It is clear that the proposed treatment of KCTC's claim does not comply with § 1129(a)(9)(D), which requires that KCTC receive "cash payments, in the same manner and over the same period, as prescribed in subparagraph (C) [of § 1129(a)(9)]." Turning to subparagraph (C), that means, *inter alia*, that KCTC's claim must be paid in regular installments "over a period ending not later than 5 years after the date of the order for relief." § 1129(a)(9)(C)(ii). Since the Debtor filed a voluntary petition, the date of the order for relief in this case was May 17, 2011. *See* § 301(b). That then means that any tax claims governed by subparagraphs (C) and (D) must be paid by May 17, 2016, five years after the order for relief. Yet, under the Plan, the payments on account of KCTC's claim would have continued well beyond this statutory deadline, until some point in 2018. Thus, the treatment of Class 2B does not satisfy § 1129(a)(9)(D).

In response, the Debtor raises a novel issue of law, arguing that § 1129(a)(9)(D) is not even applicable to KCTC's particular secured tax claim. Subparagraph (D) of § 1129(a)(9) is a relatively recent addition to the Bankruptcy Code, introduced in 2005 as part of BAPCPA. *See* Pub. L. No. 109-8, § 710(3), 119 Stat. at 127. As a result, there is limited case law interpreting this provision.[10] However, the application of § 1129(a)(9)(D) is explained simply in the *Collier* treatise:

> Section 1129(a)(9)(D), added by the 2005 Act, requires plan proponents to treat secured tax claims in the same manner as unsecured tax claims, if, but for the security, the tax claim would qualify for treatment as a priority unsecured tax claim within the meaning of section 1129(a)(9)(C).

---

remainder of KCTC's claim could not be bifurcated and treated as an ordinary secured claim.

[10] The most discussed issue surrounding secured tax claims and § 1129(a)(9)(D) concerns the interplay between the claims' impairment, classification, and their holders' ability to vote. *Compare In re Mangia Pizza Invs., LP*, 480 B.R. 669, 677–79 (Bankr. W.D. Tex. 2012) (reasoning that secured tax creditor who accepted treatment worse than what § 1129(a)(9)(D) required should not be given ability to vote), *with In re Greenwood Point, LP*, 445 B.R. 885, 906–07 (Bankr. S.D. Ind. 2011) (concluding that secured tax creditor who received treatment in accordance with § 1129(a)(9)(D) is nevertheless an impaired claim entitled to vote). None of the case law appears to be helpful to the issue faced here.

9

1  7 Collier on Bankruptcy ¶ 1129.02[9][d], at 1129-50 (Alan N. Resnick & Henry J.
2  Sommer eds., 16th rev. ed. 2013).

3      The question raised by the Debtor's response is what kind of claims fall within the
4  scope of § 1129(a)(9)(D)?  Subparagraph (D)'s language indicates that it only applies to a
5  "secured claim which would otherwise meet the description of an unsecured claim of a
6  governmental unit under section 507(a)(8), but for the secured status of that claim."  The
7  Debtor argues essentially that the reference to § 507(a)(8) establishes a predicate—that
8  the tax claim had to first be an unsecured claim covered by § 507(a)(8)—in order for the
9  mandatory treatment under subparagraphs (C) and (D) to apply.  Since priority tax claims
10 under § 507(a)(8) are expressly limited to "allowed *unsecured* claims of governmental
11 units," and given that KCTC's tax claim could never be unsecured by operation of
12 California law,[11] the Debtor contends that KCTC's tax claim could never qualify as a
13 priority tax claim under § 507(a)(8) and that § 1129(a)(9)(D) would not apply as a result.
14 It argues that § 1129(a)(9)(D) applies only to those tax claims that were unsecured at the
15 commencement of the bankruptcy case and somehow became secured during the case.
16 However, this interpretation of the statute is without any support and conflicts with the
17 plain language of the statute itself.

18     The first clause of subparagraph (D) suggests that a secured tax claim only needs
19 to "meet the description of"—or *resemble*—an unsecured, priority tax claim *but for the*

21 [11] This proposition posited by the Debtor may not be entirely accurate. According to the
22 Debtor's Disclosure Statement, KCTC's claim is made up of both real property taxes and
personal property taxes, but these taxes are secured only by the Debtor's real property. The real
23 property taxes are indeed automatically secured by a lien against real property. *See* Cal. Rev. &
Tax. Code § 2187 ("Every tax, penalty, or interest . . . on real property is a lien against the
24 property assessed."). However, that is not necessarily the case for personal property taxes. First,
25 the "[California] Revenue and Taxation Code does not . . . provide that a tax on personal
property constitutes an automatic lien on the property assessed." *Purcell v. Khan (In re Purcell)*,
26 362 B.R. 465, 470 (Bankr. E.D. Cal. 2007) (citing *T.M. Cobb Co. v. Cnty. of Los Angeles*, 16
Cal. 3d 606, 618 (1976)). Second, personal property taxes may be, but are not automatically,
27 secured by real property. *See* Cal. Rev. & Tax Code §§ 2189, 2189.3; *Bd. of Supervisors of San
28 Diego Cnty. v. Lonergan*, 27 Cal. 3d 855, 859 & n.3 (1980).

1   *claim's secured status*. It does not actually have to be an unsecured tax claim. If

2   Congress had wanted to impose the condition advanced by the Debtor, subparagraph (D)

3   would have to read, "with respect to a secured claim which would otherwise *be* an

4   unsecured claim of a governmental unit under section 507(a)(8)." Instead, Congress

5   used the more-convoluted phrase "meet the description of." By using "meet the

6   description of," rather than "be," Congress intended that a secured tax claim only

7   resemble a claim described in § 507(a)(8), without actually qualifying as one, before

8   being afforded the preferred treatment under § 1129(a)(9)(C) and (D).

9        The second clause "but for the secured status of that claim" further negates the

10  Debtor's interpretation of subparagraph (D). This "but for" language mandates that the

11  claim's secured status must be disregarded when deciding if the claim would otherwise

12  fall under § 507(a)(8). In practice, this means that to determine whether § 1129(a)(9)(D)

13  applies to a particular claim, all one must do is omit the term "unsecured" from

14  § 507(a)(8) and then look to see if the claim otherwise satisfies the characteristics

15  described in § 507(a)(8). Based on this analytical approach, it is clear that Congress

16  intended to treat certain secured tax claims the same as similar unsecured tax claims in a

17  chapter 11 plan, i.e., those secured tax claims which, *but for their secured status*, meet the

18  description of priority tax claims in § 507(a)(8).

19       Lastly, the Debtor's interpretation of § 1129(a)(9)(D) necessarily singles out a

20  particular subset of tax claims for inferior treatment, when Congress has not offered a

21  record of such an intention. Its interpretation is inconsistent with the notion that Congress

22  amended § 1129(a)(9) to improve the treatment of tax claims in general (at least those

23  kinds of taxes given priority) in chapter 11 cases, regardless of their secured or unsecured

24  status. In fact, the title for this statutory amendment was "Periodic Payment of **Taxes** in

25  Chapter 11 Cases," without any mention of the kinds of taxes affected by the amendment.

26  *See* H.R. Rep. No. 109-31, pt. 1, at 102 (2005) (emphasis added), *reprinted in* 2005

27  U.S.C.C.A.N. 88, 166. There is simply no support in the statute's language or the

28

11

1  legislative history[12] that Congress did not want to equate the preferential treatment to

2  secured tax claims with that of the otherwise unsecured tax claims.

3      The court agrees with the Bank that § 1129(a)(9)(D) applies to at least a portion of

4  KCTC's claim and that the Plan's treatment of that claim does not meet the statutory

5  requirements.  However, the Debtor has responded to the Bank's objection on two other

6  grounds, which the court will consider briefly in anticipation that they may arise in a

7  future confirmation hearing.

8      *Standing to Object.*  The Debtor argues that the Bank does not have standing to

9  object to the Plan's treatment of KCTC's claim.  Section 1128(b) of the Code generally

10  provides that "[a] party in interest may object to confirmation of a plan," and the Bank, as

11  a secured creditor, constitutes a party in interest in this case.  *See* § 1109(b) (setting forth

12  a non-exhaustive list of who may constitute a "party in interest" entitled to appear and be

13  heard in chapter 11 cases).  Nevertheless, that statutory provision is tempered by the well-

14  established rule that a party in interest only has standing to object to provisions of a plan

15  that directly affect its interest.  *See Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re*

16  *Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1075 (9th Cir. 2002) (unimpaired creditor had no

17  standing to raise unfair-discrimination objection); *Mut. Life Ins. Co. of N.Y. v. Patrician*

18  *St. Joseph Partners Ltd. P'ship (In re Patrician St. Joseph Partners Ltd. P'ship)*, 169

19  B.R. 669, 680, 682 (D. Ariz. 1994) (oversecured creditor had no standing to raise best-

20  interest-of-creditors and absolute-priority-rule objections); *In re Quigley Co.*, 391 B.R.

21  695, 703 (Bankr. S.D.N.Y. 2008) (collecting cases).  Courts have concluded, for example,

22  that creditors, who do not hold claims affected by § 1129(a)(9) (i.e., administrative

23  expense claims, priority tax claims), have no standing to argue that a plan does not treat

24  those claims in accordance with § 1129(a)(9).  *See, e.g., In re Seasons Partners, LLC*, 439

25

26      [12] Nothing else in the legislative history is otherwise helpful in this particular instance.

27  *See* H.R. Rep. No. 109-31, pt. 1, at 102, *reprinted in* 2005 U.S.C.C.A.N. 88, 166 ("In addition,
[section 710 of BAPCPA] requires the same payment treatment to be accorded to a secured claim

28  that would otherwise meet the description of an unsecured claim under section 507(a)(8).").

1  B.R. 505, 514 (Bankr. D. Ariz. 2010) (secured creditor had no standing to object to
2  treatment of priority tax claims); *In re Applied Safety, Inc.*, 200 B.R. 576, 587 (Bankr.
3  E.D. Pa. 1996) (general creditor had no standing to object to treatment of administrative
4  expense claims); *In re Adamson Co.*, 42 B.R. 169, 172 (Bankr. E.D. Va. 1984) (secured
5  creditor had no standing to object to treatment of priority claims).

6       Arguably, the Bank may be affected by how the Plan will treat KCTC's secured
7  tax claim, which could establish its standing. Both creditors hold claims secured by some
8  of the same collateral (i.e., the real property), and KCTC's tax lien has priority over the
9  Bank's consensual lien. *See* Cal. Rev. & Tax. Code § 2192.1. However, any difference
10 between how the Plan proposes to pay KCTC's claim and how the Bank believes the
11 claim should be paid (i.e., in accordance with § 1129(a)(9)(D)) would have only a
12 tangential and nominal effect on the Bank's interests. Because the Plan's treatment of
13 KCTC's claim does not "directly implicate [the Bank's] own rights and interests," the
14 Bank does not have standing to object to that provision. *In re Quigley*, 391 B.R. at 705.

15      Nevertheless, as previously mentioned, the court acknowledges that it still has an
16 independent duty to ensure that a plan satisfies all of the requirements for confirmation
17 under § 1129. *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d at 653; *see also U.S. Aid*
18 *Funds, Inc. v. Espinosa*, 559 U.S. 260, 277 & nn.14–15 (2010) (chapter 13 context)
19 (stating that the Code "*requires* bankruptcy courts to address and correct a defect in a
20 debtor's proposed plan even if no creditor raises the issue" (emphasis in original)). Even
21 if the Bank lacks standing to object on § 1129(a)(9) grounds, the court must determine on
22 its own whether the Plan satisfies the requirements of § 1129(a)(9)(D). *See Official*
23 *Comm. of Unsecured Creditors v. W. Farm Credit Bank (In re Michelson)*, 141 B.R. 715,
24 720–21 (Bankr. E.D. Cal. 1992) ("The court's role in the confirmation process is more
25 active than its role in garden-variety litigation."). Therefore, the court finds that, absent
26 KCTC's "agreement" to the Plan, the Plan does not comply with § 1129(a)(9)(D) and
27 cannot be confirmed in its present form.

28      *KCTC's "Agreement" to the Plan.* Finally, the court must consider whether

13

KCTC has "agreed" to the treatment of its claim by not objecting to confirmation. The application of subparagraph (D) of § 1129(a)(9), discussed above, is qualified with the clause, "Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim." § 1129(a)(9). When an affected creditor has "agreed" to the proposed treatment under a plan, that treatment can deviate from what is otherwise required by the statute.

Here, KCTC did not submit a ballot to accept the Plan. It was therefore deemed to have rejected the Plan. *See In re M. Long Arabians*, 103 B.R. at 215–16 (finding that bankruptcy court erred in "assum[ing] that a failure to vote constituted an acceptance of the plan"). However, whether KCTC has "*accepted*" the Plan and whether it has "*agreed*" to certain treatment under the Plan are two distinct issues, which must be separately analyzed. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (reciting the "usual rule that when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended" (internal quotation marks omitted)).

At issue here is the meaning of the term "agreed": Whether this requires that a creditor expressly or affirmatively consent to its treatment, or whether consent may be implied from its conduct, or lack thereof (i.e., from its silence). On this issue, courts are divided.[13] *Compare In re Jankins*, 184 B.R. 488, 492 n.8 (Bankr. E.D. Va. 1995) ("This

---

[13] Similar language appears in one of the confirmation requirements for a chapter 13 plan as well. *See* § 1322(a)(2) (requiring full payment of priority claims "unless the holder of a particular claim agrees to a different treatment of such claim"). Although courts are also split on this issue in the chapter 13 context, the majority of the published decisions appear to adopt the interpretation that requires affirmative consent from the affected creditor. *Compare In re Hutchens*, 480 B.R. 374, 382 (Bankr. M.D. Fla. 2012) ("Merely failing to object to a proposed Chapter 13 plan, which does not provide for full payment of a priority claim, does not constitute express affirmation."), *Fort v. Fla. Dep't of Revenue (In re Fort)*, 412 B.R. 840, 859 (Bankr. W.D. Va. 2009) (similar), *In re Glazier*, Case No. 06-20116-D-13L, 2008 WL 2148555, at *4 (Bankr. E.D. Cal. May 20, 2008) (similar), *In re Randolph*, 273 B.R. 914, 918–19 (Bankr. M.D. Fla. 2002) (similar), *and In re Northrup*, 141 B.R. 171, 173 (Bankr. N.D. Iowa 1991) (similar), *with In re Hebert*, 61 B.R. 44, 46–47 (Bankr. W.D. La. 1986) (concluding that tax creditor's

14

1 Court, however, construes the term 'has agreed' in Section 1129(a)(9) as requiring the

2 affected creditor's affirmative concurrence and not mere failure to object."), *and In re*

3 *Digital Impact, Inc.*, 223 B.R. 1, 7 & n.1 (Bankr. N.D. Okla. 1998) (similar), *with In re*

4 *Teligent, Inc.*, 282 B.R. 765, 770–72 (Bankr. S.D.N.Y. 2002) ("Congress's use of the

5 word 'agree' in section 1129(a)(9) of the Bankruptcy Code should be interpreted to

6 include implied consent.").

7      In this court's view, those courts requiring affirmative consent have the better

8 interpretation of "agreed." The court finds it difficult to apply the "implied consent"

9 interpretation particularly in this case because it bluntly contradicts the fact that KCTC,

10 by failing to cast a ballot, is deemed to have rejected the Plan. In principle, one cannot

11 conclusively reject an idea and implicitly agree to it at the same time. While KCTC does

12 not necessarily have to cast a ballot accepting the Plan, the record must show that KCTC

13 has affirmatively agreed to the Plan's treatment of its claim.[14] That can be done by a

14 written notice, stipulation, or addendum to the Plan itself. On the record before the court,

15 KCTC has not "agreed" to have its claim paid in a manner that does not comply with

16 § 1129(a)(9)(D).

17      **Feasibility: § 1129.** The last issue which the court will address is the question of

18 "feasibility;" the Bank contends that the Debtor has not shown the ability to make the

19

20

---

21 "failure to object to its treatment under the plan in this case constitutes 'agreement' to such treatment under Section 1322(a)(2)").

22     In one opinion, the Bankruptcy Appellate Panel for the Ninth Circuit mentioned briefly in a footnote that a debtor's attorney, who held an administrative expense claim entitled to priority,

23 affirmatively consented to different treatment under § 1322(a)(2) by drafting and filing the debtor's chapter 13 plan. *See Wolff v. Johnson (In re Johnson)*, 344 B.R. 104, 107 n.6 (9th Cir.

24 BAP 2006). That case does not offer much guidance here since the attorney's conduct would

25 evidence consent under either interpretation of the term "agreement."

26     [14] The same "has agreed" exception found in the preface to § 1129(a)(9) also applies to

27 the holders of administrative claims who must be paid in full, in cash on the effective date of the Plan. § 1129(a)(9)(A). Holders of administrative claims do not even get to vote for or against the

28 plan.

1  necessary Plan payments. The feasibility issue arises under § 1129(a)(11), which requires

2  the court to find that "[c]onfirmation of the plan is not likely to be followed by the

3  liquidation, or the need for further financial reorganization of the debtor or any successor

4  of the debtor under the plan, unless such liquidation or reorganization is proposed in the

5  plan." "The purpose of section 1129(a)(11) is to prevent confirmation of visionary

6  schemes which promise creditors and equity security holders more under a proposed plan

7  than the debtor can possibly attain after confirmation." *Pizza of Haw., Inc. v. Shakey's,*

8  *Inc. (In re Pizza of Haw., Inc.),* 761 F.2d 1374, 1382 (9th Cir. 1985) (quotation marks

9  omitted). To be specific, § 1129(a)(11) does not require the Debtor to prove where every

10  penny will come from; it only requires a showing that future liquidation or reorganization

11  "is not likely." In that regard, the Debtor's track record over the course of this

12  bankruptcy, including the monthly payments of adequate protection to the Bank, lends

13  significant support to a finding that the present Plan, as drafted, could be fiscally

14  successful.

15        However, the Bank's feasibility objection goes not to the question of what the Plan

16  payments are as proposed, but rather what the Plan payments should be. In other words,

17  the Bank argues that if the Debtor proposes a new plan that complies with § 1129, then

18  the Debtor would be unable to perform under such plan given the need to substantially

19  increase plan payments to certain creditors. The court has already determined that

20  payments to KCTC on a portion of its secured tax claim will have to be increased to

21  comply with § 1129(a)(9)(D). And if the Bank ultimately prevails on its challenge to the

22  interest rate payable on its claim, then a substantially higher plan payment for Class 2A

23  will be required as well. Yet, until those issues are resolved in a subsequent plan, the

24  court cannot rule on the Bank's feasibility objection.

25        If and when that issue comes back before the court, the Debtor will have to make a

26  clear and persuasive showing of its ability to produce the revenue necessary to fund the

27  increased plan payments. The Debtor will also have to do a better job of reconciling the

28  cash reported in its monthly operating reports against the balances shown in its monthly

16

1  bank statements.[15]

2  **Conclusion.**

3        Based on the foregoing, the Debtor's third amended Plan does not satisfy the

4  requirements of § 1129(a) and cannot be confirmed. Accordingly, the Debtor's motion to

5  confirm the Plan will be denied.

6

7        Dated: September _____23_____, 2013

8                                      W. Richard Lee

9                                      United States Bankruptcy Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

---

24      [15] The Bank presented an analysis of the substantial discrepancy between the cash flow
reported in the monthly operating reports and the cash balances reflected in the bank statements.

25  In summary, the bank statements do not show the increasing cash reported in the monthly
operating reports. According to the bank statements, the Debtor appears to be "breaking even"

26  each month, which raises doubts about its ability to fund the Plan. When asked to explain where
the money is going, the Debtor revealed for the first time that a substantial amount of cash is

27  being kept in a back room safe. This safe and the cash therein has never been reported in the
monthly operating reports.

28